UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNION MUTUAL FIRE INSURANCE COMPANY,

                Plaintiff and Counter-Defendant,

          -v-

MARIO TEJADA,

                Defendant and Counter-Claimant,

and PABLO BRITO,

                Defendant.

20 Civ. 9166 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Union Mutual Fire Insurance Company ("Union Mutual") issued to defendant Mario Tejada ("Tejada") a commercial liability insurance policy, which covers, *inter alia*, bodily injuries occurring on Tejada's property in the Bronx, New York. The policy contains exclusions to Union Mutual's obligation to defend and indemnify Tejada, including for injuries involving renovation or repairs, and involving independent contractors and subcontractors. In this action, Union Mutual seeks a declaratory judgment that it is not obligated to defend or indemnify its insured, Tejada, with respect to an accident at Tejada's property in which defendant Pablo Brito ("Brito") was allegedly injured.[1] On July 23, 2021, the Court denied Tejada's motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6), and granted Union Mutual's motion to amend the

---

[1] To date, Brito has not appeared in this action, despite being served on December 4, 2020. *See* Dkt. 14; Dkt. 53 (non-attendance at case management conference).

complaint.  Dkt. 29.  Union Mutual now moves for summary judgment.  Dkt. 57.  For the

following reasons, the Court denies the motion.

## I.  Background[2]

### A.  Factual Background to This Action

#### 1.  The Policy Issued by Union Mutual

Union Mutual issued a commercial package insurance policy (the "policy") to Tejada for

the property at 409 Howe Avenue, Bronx, New York 10473 (the "Bronx property"), covering the

period of December 3, 2018 to December 3, 2019.  Dkt. 55-2 ("Policy") at 2, 10; *see also* Pl.

Statement of Facts ¶¶ 1–2; Def. Counterstatement ¶¶ 1–2.  The policy provides liability coverage

of up to $500,000 per occurrence for bodily injuries occurring on the property.  Policy at 2, 13;

*see also* Pl. Statement of Facts ¶ 3; Def. Counterstatement ¶ 3.

Under the Commercial General Liability Coverage Form, the policy obligates Union

Mutual to defend Tejada against any suit "seeking [] damages even if the allegations of the 'suit'

are groundless, false or fraudulent."  Policy at 84; *see also* Pl. Statement of Facts ¶ 4 (quoting

policy); Def. Counterstatement ¶ 4 (directing Court to policy).  However, Union Mutual has no

duty under the policy to defend Tejada against any suit "seeking damages for 'bodily injury' or

---

[2] The parties took virtually no discovery, and, with the Court's consent, did not submit a joint statement of stipulated facts.  *See* Dkt. 53 at 28.  The Court thus draws its account of the underlying facts of this case from the parties' submissions in support of and in opposition to Union Mutual's motion for summary judgment.  These include, (1) in support of Union Mutual's motion for summary judgment, its memorandum of law, Dkt. 59 ("Pl. Mem."), its statement of facts, Dkt. 55-14 ("Pl. Statement of Facts"), the affidavits of Jesse Siegel, Dkt. 55-1 ("Siegel Affidavit"), James Lambert, Dkt. 55-15 ("Lambert Affidavit"), and Patrick Hobbins, Dkt. 55-16 ("Hobbins Affidavit"), its counterstatement to Tejada's facts, Dkt. 67 ("Pl. Counterstatement"), and attached exhibits; and (2) in opposition to Union Mutual's motion for summary judgment, Tejada's memorandum of law, Dkt. 65 ("Def. Mem."), Tejada's counterstatement of facts, Dkt. 62 ("Def. Counterstatement"), the declaration of Tejada, Dkt. 63 ("Tejada Decl."), the affidavit of Beverly Joaquin, Dkt. 64 ("Joaquin Affidavit"), and attached exhibits.

'property damage' to which th[e] insurance [policy] does not apply."  Policy at 84; *see also* Pl. Statement of Facts ¶ 4 (quoting policy); Def. Counterstatement ¶ 4 (directing Court to policy).

Two exclusions from coverage under the policy are relevant here: for (1) bodily injuries of independent contractors and subcontractors occurring under defined circumstances (the "Independent Contractor/Subcontractor Exclusion") and (2) bodily injuries occurring as a result of "construction, renovation or repair work" occurring under defined circumstances (the "Designated Operations Exclusion").  Policy at 82, 92; *see* Pl. Statement of Facts ¶¶ 5–6 (quoting policy); Def. Counterstatement ¶¶ 5–6 (directing Court to policy).

The Independent Contractor/Subcontractor Exclusion provides:

This policy shall only afford independent or sub-contractor's coverage when all of the following conditions have been met:

CONDITIONS – INDEPENDENT CONTRACTORS AND SUBCONTRACTORS COVERAGE

1. With respect to work performed on your behalf by independent contractors or subcontractors, if (1) each such independent contractor or subcontractor carries insurance providing coverage for the "bodily injury" or "property damage" that would be subject to the exclusions in paragraphs 2, 3 and 4 below and; (2) such insurance provides coverage and limits at least equal to that provided by this policy but for the exclusions in paragraphs 2, 3 and 4 below and; (3) you have been named as an additional insured on such insurance coverage, then the exclusions in paragraphs 2, 3 and 4 below shall not apply and this policy shall be excess over such insurance.

Otherwise;

2. This insurance does not apply to "bodily injury" or "property damage" arising out of any and all work performed by independent contractors or subcontractors, regardless of whether such work is performed on your behalf or whether such work is performed for you or for others.  This exclusion applies regardless of where such work is performed.

3. This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any and all work

performed by independent contractors or subcontractors, regardless of whether such work is performed on your behalf or whether such work is performed for you or for others.  This exclusion applies regardless of where such work is performed.

4. This insurance does not apply to "bodily injury" or "property damage" sustained by any owner, partner or employee of any independent contractor or subcontractor working for you or on your behalf, regardless of whether such work is performed on your behalf or whether such work is performed for you or for others. This exclusion applies regardless of where such work is performed.

Policy at 82; *see* Pl. Statement of Facts ¶ 5; Def. Counterstatement ¶ 5 (directing Court to

policy).

The Designated Operations Exclusion defines "designated ongoing operations" as:

Any construction, renovation or repair work being performed at any insured location, except when performed by independent contractors and/or subcontractors who have met the conditions of the Independent or SubContractors Endorsement GL UM 0684 04 13 attached to the policy.

Policy at 92; *see* Pl. Statement of Facts ¶ 6; Def. Counterstatement ¶ 6 (directing Court to

policy).  The exclusion provides:

This insurance does not apply to "bodily injury" or "property damage" arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such operations are conducted by you or on your behalf.  If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described ongoing operations conducted at that "location".

For the purpose of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

Policy at 92; *see* Pl. Statement of Facts ¶ 6; Def. Counterstatement ¶ 6 (directing Court to

policy).

### 2.    Brito's Underlying Personal Injury Action Against Tejada

On October 22, 2019, Brito commenced a civil action in New York State Supreme Court in the Bronx against Tejada (the "underlying action").[3]  *See Pablo Brito against Mario A. Tejada*, Index No. 32406/2019E; Pl. Statement of Facts ¶¶ 7–9; Def. Counterstatement ¶¶ 7–9; Dkt. 55-3 (summons and verified complaint).  Brito alleges there that on or about January 28, 2019,[4] he was lawfully on the Bronx property and "was caused to trip and fall on broken floor tile and was caused to sustain serious and severe personal injuries due to [Tejada's] negligence." Dkt. 55-3 at 4.  Brito claims that Tejada, who was "supervis[ing] . . . land construction" at the Bronx property, had "fail[ed] to provide a path for workers to conduct work" and "fail[ed] to maintain the premise clean and safe for workers."  *Id.*  The complaint does not make further allegations as to the reason or reasons Brito was on the Bronx property or his relationship with Tejada.  *See id.* at 3–5.

On June 15, 2020, Brito amended his complaint in the underlying action.  Dkt. 25-5.  On September 29, 2020, Tejada filed an answer.  Dkt. 55-6; Dkt. 61-3.

On January 28, 2021, the Bronx County Clerk received Brito's verified bill of particulars in the underlying action.  *See* Dkt. 55-12.  In it, Brito states that the incident took place on January 6, 2019.  *Id.* ¶ 5.  He states that his injuries "were caused by the carelessness, recklessness, and negligence" of Tejada, who failed, *inter alia*, "to warn of the dangers," "to maintain the floor . . . in allowing debris and tiles to litter the ground causing a slipping and

---

[3] Tejada represents that Brito separately sued his wife, Beverly Joaquin, individually in state court for the same occurrence in January 2022.  Tejada Decl. ¶ 30; Joaquin Affidavit ¶ 21.

[4] In his later amended complaint in state court, Brito stated that the incident took place on January 5, 2019, Dkt. 25-5 ¶ 4, and in a later verified bill of particulars, Brito stated that the incident took place on January 6, 2019, Dkt. 55-12 ¶ 5.

tripping hazard," and "to maintain workers' compensation insurance." *Id.* ¶ 7.  He states that Tejada "provid[ed] an unsafe work environment" and "directed [Brito's] work, directly causing his injuries." *Id.* ¶¶ 8, 13.  He states that, as a result of the incident on the Bronx property, he sustained "serious personal injuries," had to undergo surgical procedures and physical therapy, and experiences ongoing "impairment, disruption and difficulty with daily activities." *Id.* ¶ 17.

The parties here have represented that the underlying action remains pending.  Pl. Statement of Facts ¶ 8; Def. Counterstatement ¶ 8.

### 3. Union Mutual's Investigation: the August 2020 Statement Taken of Tejada by Investigator Hobbins

The parties dispute, to varying degrees, how Union Mutual learned of the lawsuit and what steps it took to investigate the lawsuit.

Union Mutual represents that, on August 17, 2020, it learned of Brito's action when it received a copy of the summons and complaint, and "immediately" undertook an investigation. Pl. Statement of Facts ¶¶ 10–11.  Tejada states, generally, that he provided Union Mutual with notice of the underlying action "as soon as" he was aware of the underlying action, but does not say when or how.[5]  Def. Counterstatement ¶ 10.

Union Mutual states that it hired First Judicial Claims Service to investigate the underlying action, and that, on August 24, 2020, Patrick Hobbins, a First Judicial Claims Service investigator, took a "witness statement" of Tejada.  Pl. Statement of Facts ¶¶ 12–13; Hobbins Affidavit ¶¶ 6, 12–15.  As detailed below, Tejada objects to Union Mutual's account of how the statement came about and the reliability of its contents.  Def. Counterstatement ¶ 12.

---

[5] Tejada states that he "can neither confirm nor deny" Union Mutual's account of how it learned of the underlying personal injury action or its investigation; he nonetheless objects to Union Mutual's characterization of its knowledge and investigation as undisputed.  Def. Counterstatement ¶¶ 10–11.

In the statement as taken by Hobbins in August 2020, Tejada stated that he and his wife Beverly Joaquin have owned the Bronx property since December 2018.  Dkt. 55-4 ("Tejada Statement") at 2.  He stated that on or about January 5, 2019, the house at the Bronx property was vacant, and he was "engaged in renovations" of the house with a group of five other persons, including Brito and Tejada's brother.  *Id.*  He stated that he has known Brito for about 18 years and previously worked with Brito at Island Acoustics, where Brito served as a drywall technician.  *Id.*  He stated that Brito sometimes "complained of pain to his shoulders from work activity" and "used to shadow box to entertain people at work and would throw himself down on the floor."  *Id.*

Tejada stated that the day of Brito's incident at the Bronx property was the first time Brito had come to the property.  *Id.*  Tejada stated that, that day, Brito "was not helping [Tejada] in exchange for money" and was "just doing [Tejada] a favor and helping."  *Id.* at 3.  Tejada stated that, that day, the group working at the property "spent the majority of the time taking out garbage and other debris that resulted from the interior renovations" and throwing the debris into a dumpster in the driveway.  *Id.* at 2.  He stated that the group was "also lifting the ceramic tiles from the kitchen as [Tejada] intended to lay new flooring down."  *Id.*  At the time, the kitchen floor was laid with 12-inch ceramic square tiles.  *Id.*  Tejada stated that the tiles had been laid by the previous owner; he did not know when the tiles had been laid or who had done that job.  *Id.*  Before Brito's accident, Tejada stated, the group had removed "about half of the tiles," leaving exposed a "sub-floor" made of plywood that Tejada believed was "in good condition."  *Id.*  As the group was lifting the tiles, Tejada stated, "any one of the tiles could have been made loose by [their] actions, including those of Mr. Brito," but he was "not aware if any specific tile in the

kitchen was loose (or was not)," nor of "the specific tile upon which Mr. Brito claims to have tripped or fallen upon." *Id.*

Tejada stated that Brito's "accident" occurred at about 10–11 a.m. "in an open space between the kitchen and living room." *Id.* The weather was "sunny and clear," with no snow or rain that day or the previous day, and the interior of the house "well lit by the numerous windows." *Id.* Tejada stated that he did not witness Brito's alleged injury as he was outside by the dumpster, along with the rest of the group except Brito and Tejada's brother, who was in the bathroom. *Id.* at 2–3. Tejada stated that, at the time, Brito "should have been throwing out garbage with us" but was instead inside the house. *Id.* at 2. Tejada stated that when he went inside the house "to see what happened," Brito "was sitting on the floor in between the kitchen and living room . . . atop a pile of broken tiles (debris), that we were going to throw out upon returning back inside the house." *Id.* at 3. Tejada stated that Brito "was involved in making that pile as he also ripped up the tiling and was very aware it was there." *Id.* Tejada stated that he did not see "any visible sign of injury" on Brito, and that Brito did not want Tejada to call an ambulance and "just wanted to go home." *Id.* Tejada stated that Brito asked for money to take a taxi because Brito "was having financial troubles." *Id.*

After the incident, Tejada stated, he called Brito "[e]very few days" to see how Brito was doing. *Id.* Tejada stated that Brito said he had "some discomfort to his shoulder" but was "otherwise fine." *Id.* The next Saturday, Tejada stated, Brito helped paint the house on the Bronx property for "about nine hours" and "didn't complain of any pain." *Id.* Afterwards, Tejada stated, he "kept in touch" with Brito. *Id.* Tejada stated that Brito asked to rent the house, and Tejada refused due to Brito's "financial troubles." *Id.* According to Tejada, Brito

"stop[ped] answering [Tejada's] calls" after this refusal.  *Id.*  Tejada stated that, as of the time the statement was taken, Brito no longer worked at Island Acoustics due to "lack of work."  *Id.*

The typed statement prepared by Hobbins and dated August 24, 2020, was, according to Hobbins, was signed by Tejada.  *See id.*; Hobbins Affidavit ¶ 17.

### 4. Union Mutual's September 2020 Disclaimer of Coverage

On September 14, 2020, Roundhill Express, LLC, the third-party claims administrator for Union Mutual, issued a disclaimer of coverage as to Brito's claim against Tejada.  Pl. Statement of Facts ¶ 34; Def. Counterstatement (directing Court to disclaimer of coverage); Dkt. 55-5 (the "Disclaimer").  The parties dispute the timeliness of the disclaimer: Union Mutual represents that its disclaimer was timely, Pl. Statement of Facts ¶ 36; Tejada objects, Def. Counterstatement ¶ 36.

As its basis to disclaim coverage, Union Mutual, drawing on Tejada's statement as taken by Hobbins, relied upon multiple exclusions of coverage.  These included the Designated Operations Exclusion, the Independent Contractor/Subcontractor Exclusion, an exclusion for obligations under workers' compensation law or similar law for injuries of individuals acting within the scope of their employment, and an exclusion for injuries of individuals "arising out of and in the course of" their employment with the policyholder.  Disclaimer at 7–8.  Union Mutual also claimed that Tejada's failure to timely report the incident and forward the lawsuit documents violated the policy.  *Id.* at 8.  Union Mutual stated that, were Tejada's failure to timely notify Union Mutual of the underlying action to prejudice Union Mutual's investigation and defense, Tejada would not receive coverage.  *Id.*

Union Mutual nonetheless assigned Tejada a gratuitous defense in the underlying action, subject to the resolution of this action.  Pl. Statement of Facts ¶ 35; Def. Counterstatement ¶ 35.

**B.      This Action**

**1.      Union Mutual's Complaint Seeking Declaratory Relief**

On November 2, 2020, Union Mutual filed the original complaint in this action.  Dkt. 1.

On January 19, 2021, the Court granted Tejada additional time to respond.  Dkt. 17.  On

February 8, 2021, Union Mutual filed the First Amended Complaint (the "FAC"), which sought

a declaratory judgment that it does not have to defend or indemnify Tejada in the underlying

action because one or more of the four policy exclusions applied (Counts One through Four);

because Tejada gave late notice of the accident (Count Five) and the state court lawsuit (Count

Six); and because Tejada failed to timely forward the lawsuit papers to Union Mutual (Count

Seven).  Dkt. 18 ("FAC").

**2.      Tejada's Motion to Dismiss and the Court's Ruling**

On February 22, 2021, Tejada moved to dismiss the FAC under Rules 12(b)(1) and

12(b)(6).  Dkt. 21.  On February 24, 2021, the Court issued an order directing Union Mutual to

either amend the FAC or oppose the motion to dismiss and adjourned *sine die* the initial pretrial

conference.  Dkt. 23; *see also* Dkt. 19.  On March 16, 2021, Union Mutual opposed the motion to

dismiss.  Dkts. 25–27.  On March 30, 2021, Tejada filed a reply.  Dkt. 28.

On July 23, 2021, the Court denied Tejada's motion to dismiss.  Dkt. 29.  As to the

challenge to subject matter jurisdiction, the Court found that Union Mutual had shown a

reasonable probability that its claim exceeded the $75,000 statutory jurisdictional amount,

thereby satisfying that element of diversity jurisdiction.  *Id.* at 6–8.  As to the challenge to the

FAC for failure to state a claim, the Court held that Union Mutual had plausibly pled, as to each

of the FAC's first four counts, that the injury implicated the policy exclusion at issue, and, as to

the FAC's fifth count, that Tejada gave late notice of the accident.  *Id.* at 9–11.  The Court found

that the FAC did not allege when Tejada learned of the underlying action, but that because Union

10

Mutual had indicated that the docket in the underlying action reflects the date on which Tejada was served, the deficiency could be easily cured. *Id.* at 10–11. Accordingly, while these claims were technically deficient, the Court permitted Union Mutual, as it had requested in opposition to the motion to dismiss, to amend the sixth and seventh counts of the FAC to allege when Tejada learned of the underlying action. *Id.* at 11–12.

### 3.    Ensuing Events

On July 27, 2021, Union Mutual filed the Second Amended Complaint (the "SAC"), whose claims were identical to those in the FAC, save that it amended the sixth and seventh claims to cure the deficiency as to when Tejada had learned of the underlying action. Dkt. 30. On August 6, 2021, the Court held an initial conference and referred the case to Magistrate Judge Robert W. Lehrburger for the limited purpose of facilitating settlement. Dkt. 34. On August 20, 2021, Tejada filed an answer and asserted a counterclaim against Union Mutual for breach of contract. Dkt. 43. On September 8, 2021, Union Mutual filed an answer to the counterclaim. Dkt. 45. On September 8, 2021, and October 6, 2021, Judge Lehrburger held, respectively, a pre-settlement call and settlement conference, but those did not result in a settlement.

On January 14, 2022, the Court held a case management conference and set deadlines for Union Mutual's motion for summary judgment. *See* Dkts. 50, 52. The Court authorized Union Mutual to move for default judgment against Brito alongside the summary judgment motion based on his non-appearance in the action. Dkt. 53 at 15. The Court further held that, insofar as the parties had taken "close to no discovery," it was unnecessary for the parties to submit—as the Court requires as a predicate to most summary judgment motions—a joint statement of stipulated facts. *Id.* at 28.

### 4.    Proceedings on Summary Judgment

#### i.    Union Mutual's Motion

11

On March 3, 2022, Union Mutual filed its motion for summary judgment, Dkt. 55, along with, *inter alia*, an affidavit from Hobbins regarding the manner in which the statement from Tejada was taken and the contents of the statement, Dkt. 55-16 ("Hobbins Affidavit"), the statement of Tejada taken by Hobbins, Dkt. 55-4 ("Tejada Statement"), a memorandum of law, Dkt. 55-13, and a statement of facts, Dkt. 55-14 ("Pl. Statement of Facts").  On April 11, 2022, Union Mutual re-filed its motion, its memorandum of law and documents labeled as an affidavit, Dkt. 58, and a declaration of Jesse Siegel, Dkt. 60.  *See* Dkts. 57, 59 ("Pl. Mem.").[6]

Union Mutual moves for summary judgment on the grounds that the Independent Contractor/Subcontractor Exclusion and the Designated Operations Exclusion apply so as to preclude coverage of the claims in the underlying action.  *See* Pl. Mem. at 1.  Union Mutual draws its version of events largely from Hobbins's affidavit and the statement Hobbins took from Tejada.  *See generally* Pl. Statement of Facts ¶¶ 14–33.  On that basis, Union Mutual contends that Brito suffered an injury "in the course of construction, renovation and/or repair work" at the Bronx property.  Pl. Mem. at 7–8; Pl. Statement of Facts ¶ 7; *see also* Pl. Statement of Facts ¶ 16 (stating that Tejada and five other persons were "engaged in the renovations" of the Bronx property); *id.* ¶ 21 (stating that the group "spent the majority of the time taking out garbage and other debris that resulted from the interior renovations being conducted"); *id.* ¶ 33 (stating that Brito was "doing Mr. Tejada a favor by helping" with the "renovation").  Because Brito's alleged injuries arose from renovation work on the Bronx property, it argues, both exclusions bar coverage of Brito's claims in the underlying action.  *See* Pl. Mem. at 4–5, 7–8.

---

[6] In deciding this motion, the Court refers to the memorandum of law filed April 11, 2022 and supporting documents filed March 3, 2022, as the majority of those documents were not re-filed and the docketing deficiency associated with those documents does not appear to be substantive.

ii.      *Tejada's Opposition*

On April 25, 2022, Tejada opposed Union Mutual's motion for summary judgment, filing, *inter alia*, a counterstatement of facts, Dkt. 62 ("Def. Counterstatement"), a declaration, Dkt. 63 ("Tejada Declaration"), and an affidavit of Joaquin, Dkt. 64 ("Joaquin Affidavit").  *See* Dkt. 65 ("Def. Mem.").  He principally asserts that disputed questions of fact preclude summary judgment.[7]  Def. Mem. at 1–2.  He challenges the admissibility and the accuracy of the statement of him taken by Hobbins.  As to the former, he terms Hobbins's affidavit inadmissible hearsay. *Id.* at 2–3.  As to the latter, relying on his declaration and Joaquin's affidavit submitted along with his opposition, Tejada asserts that "there is a question of fact as to whether Hobbins' recitation of Tejada's statements are otherwise motivated or influenced by a motive to misrepresent."  *Id.* at 2.  Even if Hobbins were not found to have acted improperly, Tejada asserts that the factual inconsistencies between the various accounts raise issues of fact about the applicability of the exclusions that preclude summary judgment.  *Id.* at 4–6.

The accounts in Tejada's declaration and Joaquin's affidavit differ materially from that in Hobbins's affidavit, as to both (1) the occasion that brought Brito to the Bronx property the day of his alleged injury and (2) the circumstances under which Hobbins took Tejada's statement.

***Events at the property***:  Tejada disputes that he was "engaged in renovating the house at the [Bronx property]" on the day of Brito's alleged injury.  *See* Def. Counterstatement ¶ 15. Tejada states that the group at the Bronx property was "not engaged in any kind of work or

---

[7] Tejada also maintains that Union Mutual must defend Tejada in the underlying action until the Court makes a final decision in this matter.  Def. Mem. at 6–7.  Because Union Mutual has undisputedly assigned a gratuitous defense to Tejada in the underlying action pending a resolution of this action, *see* Pl. Statement of Facts ¶ 35; Def. Counterstatement ¶ 35, the Court has no occasion to rule on this point.

project . . . other than cleaning up and removing debris, including tree branches from the yard."
Tejada Decl. ¶ 56.  He instead terms the occasion a "social gathering," Def. Counterstatement
¶¶ 21, 60; *see also, e.g.*, Tejada Decl. ¶ 55 ("We were socializing and doing some minor clean
up.").  He states that, in January 2019, the property was unoccupied, and he and Joaquin planned
to rent it out.  Tejada Decl. ¶ 10.  There was a pool at the Bronx property, and, Tejada states,
Union Mutual had told him it would cancel the policy if the pool was not removed.  *Id.* ¶¶ 11–12;
Def. Counterstatement ¶ 22.  He states that he and Joaquin obtained a dumpster to facilitate the
pool's removal, and that while the dumpster was present, he "was also involved in completing
some repairs, painting and otherwise cleaning up" the Bronx property.  Tejada Decl. ¶ 14; Def.
Counterstatement ¶ 22.  At the time, he states, "[t]here were cracked tiles in the kitchen, which
[he] had repaired and in some cases replaced."  Tejada Decl. ¶ 15.

   According to Tejada, "because the dumpster was present," he, his brother, and two of his
friends "decided to have a social gathering, and while together, clean up portions of the [Bronx
property]."  *Id.* ¶ 16.  "The purpose of our gathering was to socialize and talk while also doing
some clean up, some of which included removing tiles that had been removed from the flooring."
*Id.* ¶ 17; *see also id.* ¶ 20.  He states that "[n]o one was or expected to be compensated in any
way," "[f]ood and drinks were served," and the group "spent more time socializing than doing
anything else."  *Id.* ¶¶ 18–19; *see also* Def. Counterstatement ¶¶ 16, 21, 58–60.  Tejada states
that "[t]he purpose of the gathering was social, but the outcome was also productive," and the
"majority of Tejada's time on the date of Brito's alleged incident spent with friends and family
was spent socializing."  Def. Counterstatement ¶¶ 16, 59; *see also id.* ¶ 61.

   As to Brito's involvement, Tejada states that, the day of the incident, "Brito was not
working for [Tejada], being paid, retained, or [at the Bronx property] by any invitation other than

his own." Tejada Decl. ¶ 32.  Rather, Brito, whom he had "known and separately worked with" for approximately 20 years, "showed up at the [Bronx property] to help, and from what he said to look at the [Bronx property]." *Id.* ¶¶ 21–22.  Brito, Tejada states, hoped to rent the property, but since "Brito often complained of having financial problems," Tejada believed that Brito was "not a good fit" to do so.  *Id.* ¶¶ 21, 23.  Tejada believes that after Brito saw the property, "Brito then asked to join our gathering and pitch in with the clean up in order to improve his chances of renting the [Bronx property]."  *Id.* ¶ 24.  According to Tejada, Brito "was joining our work/play event as another friend."  *Id.* ¶ 25.

Although Tejada "does not contest that tiles were being cleaned up and thrown out" on the day of the incident, he disputes that the entire group was lifting tiles; he states that he alone "was individually repairing some cracked tiles."  Def. Counterstatement ¶ 27; *see also id.* ¶¶ 28– 29, 32.  Although "Brito did assist in moving debris," Brito "likewise joined in the social aspect, talking with those present, eating and drinking."  Tejada Decl. ¶ 26.  Tejada also disputes that Brito "had been ripping up the tiling"; he does not know whether Brito "was aware [the tiling] was there."  Def. Counterstatement ¶ 32.  Tejada states that he was not present at the time of Brito's alleged injury, and that, when he saw Brito, Brito "did not appear injured," and "returned approximately one week later for a similar clean up gathering."  Tejada Decl. ¶¶ 27–28.

***Circumstances of the statement to Hobbins***:  Tejada acknowledges that an investigator spoke with him in English and showed him "something written in English" on his computer. Def. Counterstatement ¶¶ 13, 41.  But he objects to calling Hobbins's account of his words as a "witness statement," as he has "limited" fluency in English and could not understand Hobbins's account, which did not "conform with [his] understanding of events."  *Id.* ¶¶ 12, 14.  Tejada is a native Spanish speaker and took his G.E.D. exam in Spanish because he could not read or write

in English.  *Id.* ¶¶ 37–39; *see also* Tejada Decl. ¶¶ 2–3.  He adds:  "Although I am able to communicate verbally in English, my fluency is limited to understanding ideas better than understanding specific words or phrases."  Tejada Decl. ¶ 4; *see* Def. Counterstatement ¶ 40.

Tejada states that Hobbins misrepresented his role in the investigation.  According to Tejada, Hobbins "advised Tejada that he was there to assist Tejada in Brito's claims against him."  Def. Counterstatement ¶ 49.  Tejada states that "Hobbins was very friendly and assured me several times that he was there to assist me," and assured him that he had $500,000 of coverage from Union Mutual.  Tejada Decl. ¶¶ 36–38.  Hobbins also "assured me that he was there to question me as to Brito's claims, and that [Hobbins] believed Brito's claims to be false." *Id.* ¶ 39.  Tejada states that "[b]ecause Hobbins assured me that he was there on my behalf against the claims Brito filed against me, I tried to answer his questions to the best of my ability in English."  *Id.* ¶ 44.  Although he "did not understand everything [Hobbins] asked," Tejada states, he "believed [he] got the basic meaning of [Hobbins's] questions" and did not expect Hobbins to mischaracterize his words.  *Id.* ¶¶ 45–46.  According to Tejada, Hobbins typed the statement on a laptop in English, but he, Tejada, was unable to read the statement before signing it.  Def. Counterstatement ¶¶ 14, 43–46; Tejada Decl. ¶ 47.  Tejada states that Hobbins did not speak to him in Spanish, obtain a translator for the conversation, or read (or have another person read) the statement aloud before asking him to sign it.  Def. Counterstatement ¶¶ 41–42, 47–48, 54–55; Tejada Decl. ¶¶ 43, 49.  Tejada states that when he asked Hobbins what he was signing, Hobbins said "something along the line of, 'it's everything we just talked about.'"  Tejada Decl. ¶ 50.  According to Tejada, Joaquin, who speaks English and Spanish fluently, was "present" for the "initial portion" of his dealings with Hobbins, including for Hobbins's statement that he was there to assist Tejada and that Tejada was "covered"; "[b]ecause of" Hobbins's representations,

Joaquin "left the room and went on with taking care of our child in another room."  *Id.* ¶¶ 40–42; *see also* Def. Counterstatement ¶¶ 51–53, 56–57.  Hobbins did not use Joaquin as an translator, despite her ability to do so.  Def. Counterstatement ¶¶ 53–55.  Nor, Tejada states, did Hobbins show the statement he prepared to Joaquin.  Tejada Decl. ¶ 59; *see also id.* ¶ 60.  In sum, Tejada states, he believes that Hobbins "misle[d] me into believing that he was there to investigate Brito's allegations, lulled me into a false sense of security, then mischaracterized the things I said to suit Union Mutual's purposes."  *Id.* ¶ 61.

 ***Joaquin's affidavit***:  Joaquin's accounts of both the events surrounding Brito's alleged injury and the Hobbins statement, though generally put, are broadly similar to Tejada's.  On the day of the injury, she states, there was a "social gathering" during which Tejada, his brother, and his friends "clean[ed] up" the Bronx property, as "often happens among friends and family in our circle of acquaintances, and is reciprocated in kind."  Joaquin Affidavit ¶¶ 15–16.  As to the witness statement, Joaquin states, she "had every belief, based on what [she] observed, that Hobbins was present to assist [Tejada] with Brito's claims"; Hobbins "essentially dismissed [her], was not interested in anything [she] had to offer, and posed no questions to [her]."  *Id.* ¶¶ 29, 33.  Joaquin opines that "Hobbins purposely avoided the issue of translation to trick [Tejada] into signing a document that would ultimately be used against him."  *Id.* ¶ 44.

### iii. *Union Mutual's Reply*

 On May 9, 2022, Union Mutual filed a reply, Dkt. 66 ("Pl. Reply"), and counterstatement of facts, Dkt. 67 ("Pl. Counterstatement").  It disputes that the Tejada and Joaquin's accounts give rise to disputed issues of material fact, while arguing that, to the extent Tejada's declaration is inconsistent with his statement to Hobbins, it should be disregarded.  *See* Pl. Reply at 1, 5–9. As to the former, Union Mutual notes aspects of Tejada's declaration that support that the Bronx

property was undergoing construction, repair, and/or renovation work at the time of the incident, and that Brito participated in these efforts. *Id.* at 3–4. These include Tejada's acknowledgment that he was undertaking repairs, there were cracked tiles in the kitchen that Tejada had repaired and replaced, and Brito helped move the debris. *Id.* at 3–5, 7–8. As to the latter, Union Mutual argues that any inconsistencies in Tejada's account should be disregarded under the sham affidavit doctrine, on the ground that his declaration contradicts both the statement taken by Hobbins and Tejada's answer to the SAC, rendering it a "sham" that was "obviously crafted to oppose a summary judgment motion," *Id.* at 2, 6. Union Mutual similarly asks the Court to disregard as "self-serving" Tejada's claim to have had difficulty understanding the statement and communicating with Hobbins in English and his claim that Hobbins took the statement with nefarious motives. *Id.* at 8–9. As to Joaquin's affidavit, Union Mutual argues that it is irrelevant to the summary judgment motion, because she does not claim to have been present when Brito's alleged injury took place. *Id.* at 9.

Union Mutual's counterstatement rejects Tejada's depiction of the gathering the day of Brito's alleged injury as social. Largely drawing on Hobbins's account of Tejada's statement, it contends that the group at the Bronx property "spent the majority of the time taking out garbage and other debris that resulted from the interior work being conducted." Pl. Counterstatement ¶¶ 59–61; *see generally id.* ¶¶ 37–57. As to the taking of Tejada's statement, Union Mutual admits that Hobbins wrote the statement in English, did not speak with Tejada in Spanish, did not request that anyone serve as a translator while he spoke with Tejada, and did not read the statement to Tejada in Spanish. *Id.* ¶¶ 41–42, 45, 47, 54–55. But it denies that Hobbins told Tejada that he was there to assist Tejada in defending against Brito's claims or that Tejada would be "covered" in the underlying action. *Id.* ¶¶ 49–50, 56–57. It also contests Tejada's denial of

18

facility with English and adopts Hobbins's benign account of the circumstances under which Tejada gave his statement.  *See id.* ¶¶ 37–40.[8]

## II.   Discussion

Union Mutual moves for summary judgment on the ground that the two policy exclusions preclude coverage of Brito's claims in the underlying action against Tejada.  Whether the exclusions apply turns on whether work and/or renovations, within the distinct terms of the exclusions, were being performed at the Bronx property on the day on which Brito claims injury.  But, as detailed below, whether such work or renovations took place—which turns on the extent to which the statement taken by Hobbins accurately reflects Tejada's account of the surrounding events—constitutes a genuine issue of material fact.  Accordingly, the Court denies Union Mutual's motion.[9]

---

[8] According to Hobbins, he spoke with Tejada in English to schedule the interview and obtain his statement, and, in doing so, had "no difficulty" communicating with Tejada, who did not "state or otherwise indicate he was having difficulty communicating in English."  Hobbins Affidavit ¶¶ 8–9; *see also id.* ¶ 10 (stating he made "small talk" with Tejada and Joaquin and did not have "any difficulty" communicating with them); Pl. Counterstatement ¶¶ 37–40, 51–53.  Hobbins states that he verbally interviewed Tejada, recorded his answers on a laptop, and asked Tejada to look at his laptop "for the purpose of reading and reviewing the Statement," after which Tejada "signed the statement, using his finger on [the] laptop screen to do so."  Hobbins Affidavit ¶¶ 12–14, 17; *see also* Pl. Counterstatement ¶¶ 37–40, 43–46, 48.  Hobbins states that he is "certain that Mr. Tejada did in fact review the Statement."  Hobbins Affidavit ¶ 15; *see also* Pl. Counterstatement ¶¶ 37–40, 42–47.  He adds that he has "every reason to think and believe that Mr. Tejada at all times could read, comprehend, and converse in the English language," and that "Mr. Tejada understood that by signing the Statement he was confirming that what it said was true and accurate to the best of his recollection."  Hobbins Affidavit ¶¶ 18–19.  According to Hobbins, "[a]t no time did Mr. Tejada ever ask [Hobbins] for the assistance of an interpreter or translator."  *Id.* ¶ 57; Pl. Counterstatement ¶ 42.

[9] In resolving this motion, the Court does not have occasion to pass judgment on Tejada's claim that Hobbins, in his dealings with Tejada, intended to deceive Tejada.  *See* Def. Mem. at 2–3.  Regardless of Hobbins's motivations, a dispute of fact exists among the accounts attributed to Tejada by Hobbins, and given in this lawsuit by Tejada.  Should the case proceed to trial, it will be for a finder of fact to determine whether and to what extent to credit each of these accounts.

### A.       Applicable Legal Standards

### 1.       Standards Applicable to Summary Judgment Motions

The Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of proving the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the nonmoving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaueser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted).  Rather, the non-moving party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (internal quotation marks omitted).  "Assessments of credibility and choices between

---

In that endeavor, the credibility and motivations of both Hobbins and Tejada will be fair game for assessment.

conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) (internal quotation marks omitted).

### 2.   Principles of Insurance Policy Interpretation

In resolving a summary judgment motion involving contract interpretation, "a court should accord [contract] language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (internal quotation marks omitted) (applying in insurance context). When contract language is unambiguous, the court may "construe it as a matter of law and grant summary judgment accordingly." *Id.* (internal quotation marks omitted). But where insurance policy language is ambiguous, the ambiguities must be construed in favor of the insured and against the insurer. *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010). Whether a policy is ambiguous is a threshold question of law for the Court. *Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006). Policy terms are ambiguous if they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted).

As to exclusions of coverage, "[t]he law governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds." *Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 880 F.3d 64, 68 (2d Cir. 2018) (internal quotation marks omitted). "The burden of proving the exclusion applies rests with the insurer." *Id.* "Policy exclusions are enforced only

when they have a definite and precise meaning, unattended by danger of misconception." *Id.* (internal quotation marks omitted).

### B.   Analysis

#### 1.   Applicability of Policy Exclusions

Union Mutual's motion for summary judgment is based on two exclusions in the policy issued to Tejada.  Materially undisputed facts, it contends, establish that these apply, excluding from coverage the personal injury claims Brito brings in the underlying action.  The Designated Operations Exclusion, as noted, applies to bodily injuries arising from "construction, renovation or repair work," unless such work is performed by an independent contractor or subcontractor who meets the conditions of the Independent Contractor/Subcontractor Exclusion.  Policy at 92.  The Independent Contractor/Subcontractor Exclusion excludes coverage of bodily injuries of independent contractors or subcontractors performing "work" on behalf of a policyholder except where the contractor or subcontractor carries insurance that, *inter alia*, "provides coverage and limits at least equal to" those of the policy; otherwise, coverage is excluded for bodily injuries "arising out of any and all work performed by independent contractors or subcontractors, regardless of whether such work is performed on [the policyholder's] behalf or whether such work is performed for [the policyholder] or for others."  *Id.* at 82.

In the circumstances here, to prevail on summary judgment, Union Mutual must show that based on the undisputed facts, Brito's alleged injury arose out of work at the Bronx property—"construction, renovation or repair work," as required by the first exclusion, and work as an independent contractor or subcontractor, as required by the second.  Tejada does not point to any evidence that Brito carried other insurance that would preclude the exclusions from applying.

22

### 2. Whether Union Mutual Has Proved that Brito's Alleged Injury Arose Out of Work and/or Renovations at the Bronx Property

In arguing that Brito's claimed injury arose out of work in circumstances triggering the exclusions, Union Mutual relies on the statement of Tejada taken by Hobbins.  *See* Pl. Mem. at 4–8.  The statement, it argues, establishes that his injuries arose out of construction, renovation, or repair work, as required by the Designated Operations Exclusion, and that in doing such work, Brito served as an independent contractor or subcontractor, as required by the Independent Contractor/Subcontractor exclusion.  That is because, crediting that statement, Brito was "brought to the premises by Mr. Tejada for work purposes, engaged in renovations[,] and [was] injured while performing said renovations."  *Id.* at 5; *see id.* at 4–8.

Union Mutual is correct that if the finder of fact were to credit Hobbins's affidavit as reliably reflecting Tejada's account, and were to credit Tejada's account to Hobbins as truthful, Union Mutual would be entitled to summary judgment.[10]  In the statement taken by Hobbins, Tejada is quoted as making multiple admissions triggering the exclusions.  These include that Tejada, Brito, and others were "engaged in . . . renovations" of the property on the day of the incident; that the group "spent the majority of the time taking out garbage and other debris that resulted from the interior renovations"; that Brito, immediately after claiming to have been injured, "was sitting atop a pile of broken tiles (debris)[] that we were going to throw out"; and

---

[10] Attempting to exclude Hobbins's affidavit, Tejada terms it "inadmissible hearsay," noting that "Hobbins can only testify as to what Hobbins says Tejada said."  Def. Mem. at 2.  That argument is incorrect.  At trial in this case, Hobbins's firsthand account of what Tejada said to him would be admissible under the hearsay exclusion for statements of a party opponent, and as such could be received for the truth of the matter asserted there by Tejada, including that Brito's injury arose out of renovation work at the Bronx property.  *See* Fed. R. Evid. 801(d)(2)(A).  Nor does Tejada have a basis to exclude Hobbins's firsthand account of the circumstances in which Tejada made that statement, including Hobbins's assessment of Tejada's facility with English during their interaction.

that Brito "was involved in making that pile as he also ripped up the tiling."  Tejada Statement at

2–3.  By this account, Brito's alleged injury arose from renovation work that he was asked to

perform and took on at the Bronx property, thus precluding coverage of Brito's claims in the

underlying action under both exclusions.  *See* Policy at 82, 92.

The stumbling block for Union Mutual's motion, however, is that Tejada has attested to a

very different account of what he said to Hobbins.  In his declaration, Tejada attests that Hobbins

"mischaracterized everything I said," Tejada Decl. ¶ 53, and that Hobbins's account "does not

comport with what I expressed," *id.* ¶ 62.  He states that, given his limited fluency in English, he

did not fully understand Hobbins's questions, and he signed the statement without reading it.  *Id.*

¶¶ 4, 45, 49; *see also* Joaquin Affidavit ¶ 44 (attesting that, in not translating the statement to her

partner, Tejada, Hobbins "trick[ed]" Tejada into signing a document that would be used against

him).  Tejada states that, had the statement been translated for him, he "never would have

signed" it.  Tejada Decl. ¶ 62.[11]  In fact, Tejada attests, the group at the Bronx property on the

day in question was "not engaged in any kind of work or project with regard to the [Bronx

property] other than cleaning up and removing debris," and had instead gathered for social

purposes.  *Id.* ¶¶ 54, 56; *see, e.g.*, Def. Counterstatement ¶¶ 21, 60 (Tejada, "together with

friends and family chipping in, [was] engaged in a social gathering equivalent to a get together

---

[11] Tejada and Joaquin also assail Hobbins for allegedly causing Tejada to participate in the
interview on false pretenses, including by "assur[ing] [Tejada] several times that he was there to
assist [Tejada] in the investigation," Tejada Decl. ¶ 36, and "assur[ing] [Tejada] that Union
Mutual would . . . defend [Tejada] against Brito's claims," *id.* ¶ 38; *see also* Joaquin Affidavit
¶ 26 (stating that Hobbins "assured [Tejada] several times that he was there to assist [Tejada] in
the investigation into Brito's claims").  In the context of the summary judgment motion, it is not
clear to the Court what these accusations add to Tejada's fundamental point, which is that the
statement taken by Hobbins does not accurately represent what Tejada said to Hobbins or what
the true facts were.

including some clean-up and minor repairs."); *id.* ¶ 59 (stating that majority of time was spent "socializing"); *id.* ¶ 61 (stating that gathering was "more akin to a productive social gathering"); Tejada Decl. ¶ 55 ("We were socializing and doing some minor clean up.").  Further, Tejada states, "Brito was not working for [him], being paid, retained, or [at the Bronx property] by any invitation other than his own."  Tejada Decl. ¶ 32.  Tejada states that Brito was not brought to the property to do work, and believes Brito had "asked to join [the] gathering and pitch in with the clean up in order to improve his chances of renting the [Bronx property]."  *Id.* ¶ 24.  Joaquin's affidavit is in accord as to the nature of the gathering, although she does not address work done in the course of it.  *See, e.g.*, Joaquin Affidavit ¶¶ 15–16 (describing occasion as a "social gathering" that "often happens among friends and family in our circle of acquaintances").

A court resolving a motion for summary judgment does not have the latitude to choose among these two varying versions of the facts.  The discrepancies among them would require resolution by a finder of fact at trial.  On the summary judgment record, a reasonable factfinder could certainly credit Hobbins that Tejada admitted facts establishing the applicability of the exclusions—namely, that renovation work was being performed on the day of Brito's alleged injury and that Tejada had enlisted Brito to undertake that work in circumstances that would make him a contractor.  Such a factfinder could also find that Tejada was capable of grasping and accurately responding to Hobbins's questions about this uncomplicated subject, and that the assembled circumstances do not undermine the statement Hobbins took as reflecting Tejada's honest account.  Such a factfinder could disregard Tejada's later protestations as untrue and as lawyer-inspired as a means to secure otherwise-lacking insurance coverage.

However, on the assembled record, a reasonable finder of fact could find otherwise.  He or she could find that Tejada had an imperfect facility with English and that, absent a translator,

such lent itself to miscommunications and misunderstandings.  A factfinder could further find

that Hobbins—inadvertently or willfully—misrecorded or spun what Tejada had said, and that

what Tejada said to Hobbins was substantially as now attested by Tejada.  There is no objective

proof of a sort, such as a video recording of the Hobbins-Tejada interaction, that might permit a

court to choose among the differing accounts, let alone in the direction of the movant, Union

Mutual.[12]  Viewing the facts in the light most favorable to the nonmoving party, *see Holcomb*,

521 F.3d at 132, the Court cannot find Hobbins's affidavit dispositive of the events on the day of

Brito's injury, such that Union Mutual could prevail as a matter of law.  *See Anderson*, 477 U.S.

at 247 (court on summary judgment may not "weigh the evidence and determine the truth of the

matter"; that is for the finder of fact at trial to do).

      In reply to Tejada's submissions challenging the Hobbins Affidavit, Union Mutual makes

three arguments: that (1) Tejada's declaration must be disregarded under the "sham affidavit"

---

[12] Tejada offers Joaquin's affidavit as supporting his account.  But insofar as Tejada does not move for summary judgment and insofar as his account alone is enough to give rise to a dispute of fact, her supporting account is of no consequence here.  In any event, Joaquin's account does not decide these factual disputes for Tejada on summary judgment.  That a factual proposition is supported by two persons and opposed by one does not give a court on summary judgment the latitude to resolve a factual dispute.  *See, e.g.*, *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." (internal quotation marks omitted)); *Rogoz v. City of Hartford*, 796 F.3d 236, 249–50 (2d Cir. 2015) (same, and holding that district court improperly disregarded factual dispute on the basis that affiant was not credible).

Even if it were proper to do so, a court could not securely resolve the factual disputes between the Hobbins Affidavit and Tejada Declaration on the basis of Joaquin's account, for at least two reasons.  For one, her account is impeachable, given her familial relationship with Tejada.  For another, although she assails Hobbins for not arranging for translation of the interview with Tejada, Joaquin's affidavit barely touches upon the content of the interview—or the events on the date of Brito's alleged injury.  As to the latter, she states that the gathering was a social one, but does not meaningfully address—one way or the other—the extent of the clean-up performed that day, by who, or under what circumstances.  *See* Joaquin Affidavit ¶¶ 15, 17.

doctrine, *see* Pl. Reply at 5–9; (2) the declaration must be disregarded because it is inconsistent

with his answer to the SAC, *id.* at 1–2; and (3) even credited as true, the declaration fails to raise

a genuine issue of material fact, because it contains admissions sufficient to establish that the

exclusions apply, *id*. at 3–5, 7–8.  None carry the day.

> i.       Whether the Court Should Disregard Tejada's Declaration Under
> the Sham Affidavit Doctrine

The "sham affidavit" or "sham issue of fact" doctrine "prohibits a party from defeating

summary judgment simply by submitting an affidavit that contradicts the party's previous sworn

testimony."[13]  *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (per curiam);

*see also, e.g.*, *Brandon v. Kinter*, 938 F.3d 21, 33 n.9 (2d Cir. 2019).  "The purpose of the

doctrine is clear: [i]f a party who has been examined at length on deposition could raise an issue

of fact simply by submitting an affidavit contradicting his own prior testimony, this would

greatly diminish the utility of summary judgment as a procedure for screening out sham issues of

fact."  *Moll v. Telesector Resources Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (internal

quotation marks omitted).  "Thus, factual issues that a party creates by filing an affidavit crafted

to oppose a summary judgment motion that contradicts that party's prior testimony are not

genuine issues for trial."  *Id.* (internal quotation marks omitted).

Application of the doctrine to disregard a witness's later statement is appropriate "where

the relevant contradictions between the first and second [statements] are unequivocal and

inescapable, unexplained, arose after the motion for summary judgment was filed, and are central

---

[13] The Second Circuit has "typically applied the sham issue of fact doctrine where a *party*
submits an affidavit that contradicts the party's own prior statements."  *In re Fosamax*, 707 F.3d
at 193.  It has not resolved whether non-expert third-party witnesses can be subject to the
doctrine.  *See Moll*, 760 F.3d at 206 n.2.

to the claim." *In re Fosamax*, 707 F.3d at 194; *see also, e.g.*, *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019); *Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 46 (2d Cir. 2005) (summary order).   However, the Second Circuit "has declined to disregard an affidavit as a sham in cases where there is a readily apparent, plausible explanation for the inconsistency, or where the deposition is only arguably contradictory to the affidavit." *Brandon*, 938 F.3d at 33 n.9 (internal quotation marks and citations omitted) (declining to apply sham affidavit doctrine where witness stated in deposition that he had been served pork "multiple" times and specified in the later statement the number of times he had been served pork); *see also, e.g.*, *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 95 (S.D.N.Y. 2020).   "[I]f there is a plausible explanation for discrepancies in a party's testimony, the court . . . should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (per curiam) (internal quotation marks omitted).   Likewise, where "a declarant's prior testimony and summary judgment declaration are not in direct contradiction, mere tensions or inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment." *Fed. Deposit Ins. Corp.*, 500 F. Supp. 3d at 95.   And "when earlier testimony is contradicted by evidence other than the deponent's subsequent affidavit, the concern that the proffered issue of fact is a mere sham is alleviated." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 87 n.4 (2d Cir. 2021) (internal quotation marks and alterations omitted).

Therefore, "[i]n the ordinary case where a district court is asked to consider the contradictory deposition testimony of a fact witness, or where the contradictions presented are not 'real, unequivocal, and inescapable,' the general rule remains that 'a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the

assessment of a witness's credibility is a function reserved for the jury.'" *In re Fosamax*, 707

F.3d at 194 n.4 (quoting *Fincher v. Depository Tr. & Cleaning Corp.*, 604 F.3d 712, 725 (2d Cir.

2010)).

For an obvious reason, the sham affidavit doctrine does not preclude Tejada's declaration

here, and Union Mutual's attempt to invoke the doctrine is easily put aside.  Prior to his

declaration, Tejada had not given any sworn testimony or submitted any sworn declaration in

this litigation—let alone sworn statements in conflict with his present declaration.  The sole basis

to which Union Mutual points in its attempt to silence Tejada is the Hobbins Affidavit, which

attaches a witness statement signed by Tejada in Hobbins's presence.  But that statement does

not have any of the indicia of reliability or solemnity of the sorts of statements—typically

deposition testimony or sworn declarations submitted in the litigation—to which the sham

affidavit doctrine has been held to apply.  It is a witness statement, taken by a private

investigator, taken before any proceedings in this action, not made under oath, and not made with

the guidance or in the presence of counsel.[14]  *Cf. In re Fosamax*, 707 F.3d at 195 (sworn

deposition testimony); *Bentley*, 935 F.3d at 88 (sworn deposition testimony).  Union Mutual has

not cited any case authority applying the doctrine in any remotely similar context.[15]

---

[14] The statement taken by Hobbins may also be subject to the methodological deficiencies—
based on a language barrier and a lack of a fair opportunity to review and correct the statement—
that Tejada's declaration seeks to raise.  A party's counseled deposition or declaration—the sorts
of submissions to which the doctrine typically applies—ought not, in the main, present problems
of this nature.  At the pre-motion conference, Union Mutual stated that it had elected to forego
the familiar tool of deposing Tejada (and thereby locking in his sworn account on the salient
points so as to prevent a contrary declaration from arising on summary judgment).  *See* Dkt. 53
at 5 (plaintiff's counsel: "[W]e never took any depositions and we have no intention of doing a
deposition of the defendant.").

[15] As its primary example, Union Mutual cites *Polin v. Kellwood Co.*, 132 F. Supp. 2d 126
(S.D.N.Y. 2000).  There, the district court applied the logic of the sham affidavit doctrine to

Even if, improbably, the doctrine could apply to unsworn, uncounseled, pre-litigation statements taken by an adversary's investigator, there would be compelling reasons not to apply it here.  Tejada has asserted that, due to his limited fluency in English, he "did not understand everything [Hobbins] asked," Tejada Decl. ¶ 45, and was unable to read the statement before signing it, *id.* ¶¶ 2, 52.  That claim may or may not be truthful, but it is facially plausible, and a court cannot dismiss it out of hand, as Union Mutual invites.  Where there is a "plausible explanation" for the differences between the challenged statement and a later one, and where there is a viable challenge to the integrity of the initial statement, a court "should not disregard the later testimony," particularly where the initial statement may merely have been "ambiguous, confusing, or simply incomplete," *Rojas*, 600 F.3d at 106 (internal quotation marks omitted).

Finally, although this point is not decisive here, the discrepancies between the statement taken by Hobbins and Tejada's declaration are not, in this Court's assessment, sufficiently "unequivocal and inescapable," *In re Fosamax*, 707 F.3d at 194, to warrant disregarding Tejada's declaration.  The statement and declaration each described, using different words and supplying different contextual background, "work" conducted on the Bronx property.  In the statement prepared by Hobbins, Tejada stated that he was "engaged in renovations" of the Bronx

---

reject an affidavit, filed on a motion for reconsideration, that substantiated the affiant's claim in an unsworn letter about an arbitrator's purported misconduct.  *Id.* at 129–30.  In doing so, the *Polin* court emphasized that the affiant had declined to substantiate the allegations in the letter on two previous occasions: first, when directly asked to do so before an arbitral panel and second, on cross-motions to vacate or confirm the arbitrators' ruling.  *Id.* at 129.  The court reasoned that, in "the interests of finality and fundamental fairness," it was "simply too late" for the affiant to "create an issue."  *Id.* at 130.  This case is inapposite for at least two reasons.  First, in contrast to the letter written by the affiant himself in *Polin*, the statement challenged here is a secondhand recitation, by Hobbins, of verbal statements he claims were made by Tejada.  Second, unlike the affiant in *Polin*, Tejada submitted his declaration challenging the veracity of the statement taken by Hobbins at his first opportunity to do so.

property and that the group at the property "spent the majority of the time taking out garbage and other debris that resulted from the interior renovations." Tejada Statement at 2. In his declaration, Tejada stated that he was engaged in a "social gathering," Tejada Decl. ¶ 16, with the purpose of "socializ[ing] and talk[ing] while also doing some clean up," *id.* ¶ 17, and that the group "spent more time socializing than doing anything else," *id.* ¶ 19. These accounts are tonally different but do not bespeak the sorts of black-and-white contradictions to which the sham affidavit doctrine applies. These instead are the sorts of "tensions" to which the doctrine ill applies. *Fed. Deposit Ins. Corp.*, 500 F. Supp. 3d at 95.

The Court therefore rejects Union Mutual's bid to exclude Tejada's declaration on summary judgment based on the sham affidavit doctrine.

> ii.    *Whether the Court Should Disregard Tejada's Declaration Because It Contradicts His Answer to the SAC*

Union Mutual next argues that Tejada's declaration must be disregarded because it is inconsistent with his answer. There, while disputing that any of the asserted exclusions apply, Tejada denied "having knowledge or information sufficient to form a belief as to the accuracy of" two of Union Mutual's allegations in the SAC: that (1) Tejada "was supervising certain construction work" at the Bronx property, and (2) "[t]he circumstances giving rise to the Underlying Action arose out of ongoing construction, renovation, and/or repair work" at the property. Pl. Reply at 5 (citing Tejada's answers to paragraphs 17 and 31 of SAC); Dkt. 30 ¶¶ 17, 31; Dkt. 43 ¶¶ 17, 31.

Union Mutual is right to fault Tejada's counsel for the rote submission of answers by their client denying knowledge that it is clear that Tejada possessed. Such was below the standards of this District. And the doctrine of judicial estoppel exists to police some abuses of this kind. "Where a party assumes a certain position in a legal proceeding, and succeeds in

maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).  The doctrine of judicial estoppel precludes a party from advancing a new position where, *inter alia*, "a party's later position is clearly inconsistent with its earlier position," and "the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."  *Id.* (internal quotation marks omitted).  Judicial estoppel of a later statement hinges on "the narrower question of whether the statements can be reconciled, not whether a fact-finder would necessarily adopt the interpretation which reconciles them."  *Id.* at 104.  Such estoppel applies in various contexts, including based on a party's statement on a sworn administrative form, *id.* at 102–04, and a party's answers in contention interrogatories, *see, e.g.*, *Sofia v. Esposito*, No. 17 Civ. 1829 (KPF), 2019 WL 6529432, at *7 (S.D.N.Y. Dec. 4, 2019).

Here, however, although Union Mutual's argument is a substantial one, there is enough flexibility and ambiguity in the propositions that Tejada answered to dissuade the Court from blocking his later testimony on account of his two boilerplate denials.  The statement that Tejada was "supervising certain construction work" which Union Mutual asked him to answer did not clearly define the "certain construction work" at issue.  Furthermore, in the informal and predominantly social setting under which, by Tejada's account, any such work took place, the concept of "supervision" of such work, with its connotation of a structured command arrangement, may have been unnatural to apply.  And Union Mutual's allegation about the type of work being performed—rather than granularly describing the actual tasks at hand—tracked the text of the policy exclusion, in effect asking Tejada less a factual question and more whether he agreed that the policy did not apply.  Given the informal nature of the work as Tejada now

presents it, his denials of knowledge may be defensible on the grounds that the allegations

embedded undefined policy terms as opposed to asking about concrete facts.  Ultimately,

Tejada's declaration is not so "clearly inconsistent," *DeRosa*, 595 F.3d at 103 (internal quotation

marks omitted), or irreconcilable with his answers to the SAC disclaiming knowledge to

propositions put by Union Mutual in stilted policy terms that it is proper to disregard the

declaration altogether.  That is especially true at the summary judgment stage, where the Court

must "resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (internal quotation

marks omitted).  At trial, Union Mutual will be at liberty to cross-examine Tejada on the ground

that his denials of knowledge in his answer were false statements.  Such, in the Court's

judgment, is the proper remedy, in the context here, for Tejada's arguably rote denials.

     In any event, Union Mutual's attempt to hold Tejada to his answer denying knowledge is

problematic on its own terms.  Having taken next to no discovery, Union Mutual's sole apparent

basis for claiming that the two exclusions apply is Tejada's statement to Hobbins.  If Tejada's

answer were read—as Union Mutual asks—as conclusive on the broad point of whether he knew

anything about the construction at the Bronx property, such would presumably undermine, too,

Tejada's statement to Hobbins, which recounted facts about work on that property.  To be sure,

Tejada's statement to Hobbins, *see* Tejada Statement, was taken approximately one year before

Tejada's answer to the SAC, which was filed on August 20, 2021, *see* Dkt. 43.  Nonetheless,

Union Mutual does not cite any authority supporting its bid to simultaneously hold Tejada to his

disclaimer of knowledge about certain allegations in the SAC while using Tejada's contrary

statement to Hobbins to meet its evidentiary burden on summary judgment.  *Cf. Wallace v. City

of N.Y., Dep't of Educ.*, No. 20 Civ. 1424 (KPF), 2021 WL 6127386, at *14–15 (S.D.N.Y. Dec.

28, 2021) (rejecting estoppel argument based on city entity's denial of knowledge in response to requests for admission).

> ### iii. Whether the Policy Exclusions Apply Even Under Tejada's Version of the Facts

Union Mutual's most substantial argument is that Tejada's declaration itself admits facts sufficient to establish the policy exclusions. *See* Pl. Reply at 3–5, 7–8. This argument presents a close question, but ultimately there is a sufficient dispute of fact to preclude entry of summary judgment.

Tejada's declaration does suggest that some sort of "work" took place on the Bronx property the day of the incident. Tejada states that he, personally, was "involved in completing some repairs, painting and otherwise cleaning up" the Bronx property. Tejada Decl. ¶ 14. He states that, that day, the group, including Brito, was "cleaning up and removing debris, including tree branches from the yard," *id.* ¶ 56, and helped to, *inter alia*, "remov[e] tiles that had been removed from the flooring," *id.* ¶ 17, and "mov[e] debris," *id.* ¶ 26, to the dumpster. Tejada also at one point calls the gathering a "work/play event." *Id.* ¶ 25.

These admissions do not, however, *in haec verba* go far enough. Tejada states that the group was "not engaged in any kind of work or project with regard to the [Bronx property] other than cleaning up and removing debris," *id.* ¶ 56, and repeatedly characterizes the occasion as a "social gathering," *id.* ¶ 16; *see, e.g.*, *id.* ¶¶ 55–58. He represents that "[t]he purpose of our gathering was to socialize and talk while also doing some clean up," *id.* ¶ 17, the group "spent more time socializing than doing anything else," *id.* ¶ 19, and "[n]o one was or expected to be compensated in any way," *id.* ¶ 18. As to Brito's involvement, Tejada states that Brito "was not working for [Tejada], being paid, retained, or [at the Bronx property] by any invitation other than his own," *id.* ¶ 32, had "showed up at the [Bronx property] to help, and from what he said to look

at the [Bronx property]," *id.* ¶ 21, and "asked to join our gathering and pitch in with the clean up in order to improve his chances of renting the [property]," *id.* ¶ 24.  Joaquin similarly states that "[n]o 'work' was being done," and that the Bronx property "was not being altered or modified, just cleaned up," while "the group was talking and socializing."  Joaquin Affidavit ¶ 17.

Viewing these representations in the light most favorable to Tejada, the Court cannot conclude, as a matter of law, that the exclusions preclude coverage of Brito's claims in the underlying action.  The question is closest as to the Designated Operations Exclusion.  But even as to it, Tejada's statement leaves less than decisive whether the informal "clean up" gathering he and Joaquin described—in which the group spent the majority of time socializing, in which the work entailed clean-up and tidying, and in which no one was compensated for his or her work—constitutes "construction, renovation or repair work," Policy at 92.  Union Mutual does not supply dispositive authority applying the exclusion to, as described, casual and informal efforts of this nature.

As to the Independent Contractor/Subcontractor Exclusion, Tejada's declaration does not establish that Brito did anything more than volunteer to help out at a social gathering with clean-up of a work site.  The statement is explicit that Brito was not retained to work for him and that he volunteered to join the gathering to better position himself to rent the Bronx property.  Under these circumstances, summary judgment cannot be entered for Union Mutual on the proposition that Brito necessarily was acting as an "independent contractor[] or subcontractor[]," Policy at 82.  Again, Union Mutual, notwithstanding its burden in seeking summary judgment that the exclusion precludes coverage, does not supply case authority applying the exclusion in like circumstances. *See Beazley Ins. Co.*, 880 F.3d at 68.

Separately, Tejada's version of the facts also leaves hazy how Brito's alleged injury arose on the date in question, including whether it arose from "work."  Such, however, is required by both exclusions.  *See* Policy at 82, 92.  This independently blocks Union Mutual's bid to obtain summary judgment on the basis of Tejada's declaration.

## CONCLUSION

For the foregoing reasons, the Court denies Union Mutual's motion for summary judgment.  The case will now proceed to trial on all outstanding issues.

The Court directs the parties promptly to confer, and, within three weeks of this decision, to submit a joint letter setting forth their positions as to whether there is a right to a jury trial to resolve this case and whether, if such a right exists, any party seeks a jury trial.[16]  The Court will thereafter set out a schedule for the submission of a joint pretrial order and motions *in limine* consistent with the Court's Individual Rules and Practices.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 57.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: January 9, 2023
       New York, New York

---

[16] At the pre-motion conference, the Court directed counsel to address this issue in their summary judgment submissions.  *See* Dkt. 53 at 28–30.